**E-FILED**
Wednesday, 29 March, 2006  03:57:52 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF ILLINOIS – SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JODI L. BAKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 04-3145 |
| | ) | |
| JoANNE B. BARNHART, | ) | |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

CHARLES EVANS, U. S. Magistrate Judge

The Court now considers the parties' cross-motions for summary judgment. Defendant JoAnne B. Barnhart, the Commissioner of Social Security (the "Commissioner"), has issued a final decision denying Plaintiff Jodi Baker ("Baker") Disability Insurance Benefits ("DIB") pursuant to Title II of the

Social Security Act (the "Act"), 42 U.S.C. §§ 416(i), 423, or Supplemental Security Income ("SSI") under Title XVI of the Act.  In her decision, the Commissioner determined that Baker was not disabled under the Act.  The Commissioner asks the Court to affirm that decision.  Baker asks the Court to reverse the Commissioner's decision.

## FACTS

Baker has a high school education and past work experience as a jewelry salesperson, corrections personnel, construction worker, and security guard.  She has a history of headaches, neck and arm pain.

In August 1998, Baker was admitted to the hospital with chronic daily headaches, vomiting, and nausea.  Although magnetic resonance imaging ("MRI") showed normal brain activity, Baker was diagnosed as having intractable classic migraine headaches.  A cervical spine MRI showed Baker also had a mild central disc herniation at C5-C6 causing several central canal stenosis.  Baker underwent an anterior cervical discectomy of C5-C6 in October 1998.  The surgery did not alleviate Baker's symptoms.

When Baker complained of depression stemming from her relationship with her boyfriend and the fact that she lost her job due to downsizing, she was prescribed Wellbutrin and Trazodone.  In February 1999, Dr. David

2

Brentnall noted that Baker was taking more Trazodone than prescribed. Dr. Brentnall referred her for counseling.

Baker underwent a second cervical discectomy on July 1, 1999. In August 1999, Dr. Brian Russell, the neurosurgeon who treated Baker, opined that Baker should be permitted to return to work without any restrictions. An October 1999 examination showed that Baker had normal strength and nice fusion as a result of the discectomy. Dr. Russell concluded that Baker could resume activities as tolerated. Baker was prescribed a muscle relaxant to aid her recovery.

Dr. Brentnall treated Baker for occasional migraine headaches in October 1999, prescribing Reglan and Midrin. Baker was hospitalized during this time with a migraine headache that was accompanied by vomiting and photophobia. Her symptoms were alleviated with Demerol and Vistaril.

At the state agency's request, Dr. Vittal Chapa examined Baker in December 1999. At the examination, Baker demonstrated good bilateral hand grip and the ability to perform fine and gross manipulations with both hands. Baker had no motor weakness or muscle atrophy. Dr. Chapa found no evidence of muscle spasm either. No range of motion limitations were noted, with the exception of the cervical spine.

3

In January 2000, Dr. Russell examined Baker and noted that she had good hand grip and symmetrical reflexes. A contemporaneously consultation with clinical psychologist Stephen Vincent showed that Baker was cognitively slow but logical and relevant. Baker's mood and affect were moderately to moderately severely depressed and Dr. Vincent diagnosed her major depression. However, Baker had intact grooming and hygiene and was able to live on her own. She could drive, watch television, listen to the radio, talk on the phone, attend church, talk to neighbors, and dine out.

In February 2000, x-rays revealed "remarkable healing" and Dr. Russell opined that Baker's post-operative status was good and stable. Baker complained of numbness when turning her head from side to side as well as in her arm, but Dr. Russell could not find any obvious weakness. Baker's upper extremity reflexes were brisk and she had no spasticity in her gait. However, Baker continued to have post-operative symptoms and Dr. Russell indicated that she might have chronic neck pain. He referred her to a pain management center. Dr. Russell did not feel comfortable supplying her with more narcotics.

On March 7, 2000, Dr. Edward Trudeau performed a nerve conduction ("NCV") and electroneuromyographic ("EMG") examination on Baker. The

4

tests revealed tenderness to palpation in Baker's right forearm, over the cervical region, and over the left shoulder. A detailed needle EMG examination revealed right upper extremity irritability, but showed that other muscles were normal. A detailed nerve conduction was also normal.

Dr. Trudeau noted some hypoesthesia in Baker's right fingers and some weakness of her right triceps, right wrist, and finger extensors. He opined that Baker had mild right C7 radiculopathy, but found no evidence of radiculopathy, cervical root lesion, median neuropathy in the wrist or elbow, or brachial plexopathy on either side. Dr. Trudeau concluded that cases such as Plaintiff's "heal with the passage of time" with conservative treatment.

In 2000, Baker received a series of cervical epidural injections administered by anesthesiologist Dr. Martin. Dr. Martin noted that Baker had minimal symptoms for up to 10 days post-injection. Baker reported improved sleep after taking Doxepin. Baker was also examined by Dr. Salvacion in October 2000. Dr. Salvacion opined that Baker suffered from cervical radiculopathy and cervical degenerative disease.

A March 24, 2001, MRI on Baker's cervical spine showed a moderate sized central osteophyte/disc complex which came in contact with the anterior surface of the spinal cord at C4-C5. Baker's doctor felt that she had moderate

osteophytosis, left posteriolaterally at both C5-C6 and C6-C7 resulting in at least moderate narrowing of the neuro foramina. Baker also exhibited post-surgical changes at C5-C6.

In February 2002, Dr. Russell further opined about Baker's condition. He reported that x-rays, following the second surgery, revealed no "notable abnormalities." A May 2, 2002, report from Dr. Stuart Hohm indicated that Baker was suffering from chronic neck pain and bilateral arm pain and had been suffering from these problems for at least five years. On June 22, 2002, Dr. Mark Greatting opined that Baker had a positive Tinel's over her left cubital tunnel radiating into the ulnar nerve distribution and a positive Phalen's, and a positive median nerve compression over her carpal tunnel on both the right and left side. Dr. Greatting found Baker to be in severe pain and concluded that the pain was aggravated by manipulation of either extremity. Dr. Greatting believed that the findings could be suggestive of thoracic outlet syndrome as well as peripheral nerve entrapment problems.

### The Administrative Hearing

Baker suffered an injury at work in June 1996. She applied for DIB and SSI on August 30, 1999, alleging that she became disabled on June 6, 1996, due to neck pain that resulted in cervical surgeries, upper extremity

6

symptomatology, low back symptomatology, and depression.  The state agency denied her applications initially and on reconsideration.  Baker requested a hearing and, on August 23, 2001, she appeared with her counsel and testified at an August 2001 administrative hearing.

At the hearing, Baker said that she had problems grasping and using her hands.  She testified that medications took the "edge off."  She said that she applied her own makeup, prepared occasional meals for herself, drove a car regularly, did a little laundry, visited with her grandmother 1-2 times a week, maintained 4-5 good friendships, and bathed and dressed herself.  Baker said she could not use a handle to lift a gallon of milk and needed assistance from her other arm.  Baker also claimed to have concentration problems when reading, migraine headaches every few weeks, and problems with her neck.

Vocational expert ("VE") J. Stephen Dolan testified about the availability of jobs for an individual with Baker's age, education and work experience, and a residual functional capacity for light work that involved no more than occasional overhead work, no climbing or work at unprotected heights, or using a strong or sustained grip or grasp, and did not require rapid or repetitive

7

head/neck turning.   The VE identified a significant number of light work[1] in the economy that would accommodate such an individual, including jobs as a cashier (30,000 positions statewide) and office clerk (8,000 positions statewide).

Based on the medical evidence, Baker's testimony, and the testimony of the VE, Administrative Law Judge Barbara Welsch (the "ALJ") issued a June 19, 2001, decision denying Baker's claim.   The ALJ specifically found that Baker was not disabled because a person with Baker's residual functional capacity ("RFC") and vocational profile could perform a significant number of jobs.   Baker was 30 years old at the time of the ALJ's decision.

The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Baker's request for review.   Baker timely sought judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## STANDARD OF REVIEW

Judicial review of the Commissioner's decision is authorized by 42 U.S.C. § 405(g).   The Commissioner's findings as to any fact are conclusive if they are supported by substantial evidence.   See Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997).   "Substantial evidence" means "such relevant evidence

---

[1]   Light work entails lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§ 404.1567(b); 416.967(b).

8

as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); Brewer, 103 F.3d at 1390. A court may not reevaluate the facts, reweigh the evidence, or substitute its own judgment for that of the Commissioner. Id. If reasonable minds could disagree on whether an individual is disabled, a court must affirm the ALJ's decision denying benefits. See Books v. Chater, 91 F.3d 972, 978 (7th Cir. 1996). However, reversal is required if the Commissioner commits an error of law. See Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997).

## ANALYSIS

An SSI or DIB claimant must be "disabled" in order to receive disability benefits. See 42 U.S.C. § 423(a)(1)(D); 42 U.S.C. § 1382(a); Pope v. Shalala, 998 F.2d 473, 477 (7th Cir.1993). An individual is "disabled" if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See Jones v. Shalala, 10 F.3d 522, 523-24 (7th Cir.1993). To satisfy this definition, an individual must have a severe impairment that renders her unable to do her previous work or any other

9

substantial gainful activity that exists in the national economy.  See 20 C.F.R. § 404.1505(a).   The claimant has the burden of proving that she is disabled within the meaning of the Social Security Act.   See Steward v. Bowen, 858 F.2d 1295, 1297 n.2 (7th Cir. 1988).

The Social Security regulations employ a five-step process for determining whether a claimant is "disabled."   See 20 C.F.R. § 404.1520.   First, the ALJ considers whether the claimant is presently employed or "engaged in substantial gainful activity."  20 C.F.R. § 404.1520(b).   If she is, the ALJ, secondly, finds that the claimant is not disabled and the evaluation process is over.   If the claimant is not engaged in substantial gainful activity, the ALJ determines whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).   Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. See Brewer, 103 F.3d at 1391.

  If the impairment does not so limit the claimant's remaining capabilities, the fourth step is that the ALJ reviews the claimant's RFC and the physical and mental demands of her past work.   RFC is a measure of what an individual

can do despite the limitations imposed by her impairments.  See 20 C.F.R. §§ 404.1545(a), 416.945(a).  If the claimant can perform her past relevant work, she will be found not disabled.  See 20 C.F.R. § 404.1520(e).  Fifth, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant—in light of her age, education, job experience and functional capacity to work—is capable of performing other work and that such work exists in the national economy.  See 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

The ALJ's decisions as to Step 1 and 2 are uncontested.  Thus, the Court only reviews the record with respect to Steps 3, 4, and 5.

## A.    *Step 3 - Severity of Impairment*

Baker argues that the ALJ erred in concluding that her impairments were not conclusively disabling.  In particular, Baker contends that her impairments satisfied Listings 1.05C, 11.08, 11.14, and 12.04.

Baker can only satisfy her burden by showing that every requirement of a Listing has been satisfied.  See  Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999).  Listing 1.05C requires:

Other vertobrogenic disorders (e.g., herniated nucleous pulposes,

11

spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months. With both 1 and 2:

> 1. Pain, muscle spasm, and significant limitation of motion in the spine; and
> 2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

See 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.05C.

Baker presents a variety of evidence to show that her deficiencies satisfy Listing 1.05C. However, she disregards a great deal of contrary evidence.

After Baker's cervical fusion, the state agency's physician found that Baker had no muscle weakness or atrophy, demonstrated good hand strength, and had no significant reflex loss. Baker also had no range of motion deficits, muscle weaknesses, or neurological deficits in her right hip. In January 2000, Baker's own doctor, Dr. Russell, noted that Baker had good bilateral hand grip. Dr. Chapa similarly observed that Baker had good bilateral hand grip and noted that she could perform fine and gross manipulations with both hands. After examining Baker, Dr. Chapa determined that she had a limited range of motion with respect to her cervical spine, but found no evidence of motor weakness, muscle atrophy, or muscle spasm. This evidence shows that the ALJ had an ample basis for finding Baker did not satisfy all of Listing 1.05C's requirements.

Baker also claims that her impairments satisfy Listings 11.08 and 11.14. Listing 11.08 describes a disability where a spinal cord or nerve root lesion with significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements. Similarly, Listing 11.14 addresses peripheral neuropathies with disorganization of motor function. Baker claims that Dr. Trudeau's October 11, 2000, and January 22, 2002, reports, Dr. Greatting's June 22, 2000, report, her positive Tinel's and Phalen's, and her own testimony about being unable to hold something for even 3 minutes due to numbness in her hands show that she has satisfied Listing 11.08 and/or Listing 11.14.

The medical evidence shows that Baker cannot satisfy Listing 11.08 or Listing 11.14. The term "persistent disorganization of motor function" looks to the degree of interference with locomotion and/or interference with the use of hands, fingers, and arms, resulting commonly from conditions such as paresis, paralysis, tremor, ataxia, and sensory disturbances. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00C. Dr. Trudeau noted that detailed NCVs were normal and that detailed needle EMGs, while revealing right upper extremity, showed that other muscles were normal. There was no evidence of radiculopathy, cervical root lesion, median neuropathy in the wrist or elbow, or brachial

plexopathy.    Based on this information, the ALJ could conclude that Baker failed to satisfy either Listing 11.08 or Listing 11.14.

Next, Baker contends that she satisfied Listing 12.04.  Listing 12.04A requires medically documented persistence, either continuous or intermittent, of a depressive, manic, or bipolar syndrome.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(A)(1)-(3).

The evidence showed that Baker was diagnosed with depression on February 3, 1990.    Dr. Vincent, a clinical psychologist, reached the same conclusion when he saw Baker on January 14, 2000.    Dr. Vincent reported that Baker felt chronically sad or unhappy, pessimism, loss of enjoyment, self-dislike, emotional over-sensitivity, poor sleep habits, lethargy, inability to concentrate, reduced libido, inability to concentrate, and loss of appetite followed by binge eating.   Baker also stated that, although she lived alone, she needed considerable help from her mother to maintain hygiene and grooming and to cook and clean the house.

While this evidence may satisfy Listing 12.04A, it does not satisfy the criteria in Listing 12.04B.   Listing 12.04B requires that an impairment result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; deficiencies of

14

concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner; or, repeated episodes of deterioration or decompensation in a work or work-like setting that causes the individual to experience exacerbation of signs and symptoms.   See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B)(1)-(4).

Although the ALJ found Baker suffered from depression, the ALJ determined that Baker did not satisfy Listing 12.04B.   The evidence in this regard showed that Baker had slight/mild, not marked, restrictions in the functional areas of maintaining daily activities and social functioning. Baker was able to maintain her grooming and hygiene, she drove a car, watched television, talked on the phone, attended church, talked to neighbors, ate at restaurants, prepared simple meals, did some laundry, visited with her grandmother at least once a week, and had 4 or 5 people with whom she maintained good friendships.   All of this shows that Baker was not markedly restricted in terms of social functioning and activities of daily living.   See Foster v. Bowen, 853 F.2d 483, 491 (6th Cir. 1988) (plaintiff not markedly restricted in maintaining daily activities or social functioning where she was able to do some housework, and despite her failure to get dressed each day and her long-term absences from attending church).

15

Moreover, the evidence showed that Baker did not have repeated episodes of deterioration or decompensation in a work or work-like setting that exacerbated her depression.  Baker lost her job due to downsizing, not because of deterioration or decompensation.  Accordingly, this too shows that the ALJ properly found that Baker failed to satisfy Listing 12.04B.

**B.      *Step 4 - Residual Functional Capacity (RFC)***

At Step 4, the ALJ determined that Baker had an RFC to perform light work that did not require climbing to or working at unprotected heights, repetitive turning of the head and neck,  frequent overhead work, strong grasping and gripping, or more than routine, repetitive tasks.  Although these findings comport with 20 C.F.R. §§ 404.1520(e), 404.1545; 416.920(e), and 416.945, Baker contends that the ALJ did not take all relevant evidence into consideration.

Baker contends that the ALJ gave the opinions of the state agency's doctors too much weight when determining her RFC.  This contention is incorrect.  The record shows that the ALJ gave Baker the benefit of the doubt when the state agency's doctors offered opinions that were at odds with the opinions of Baker's own physicians.  For instance, when the state agency's physician

16

opined Baker could perform medium work, the ALJ—consistent with Baker's doctors' opinions—found that Baker only had an RFC for light work.

Baker is also mistaken when she claims that the ALJ erred by not incorporating Dr. Vincent's findings into the mental RFC detemination. Although Dr. Vincent's examination indicated that Baker was lethargic and depressed, it also indicated that she was oriented in all spheres and had logical, relevant thought process.    Dr. Vincent did not state any mental limitations. Accordingly, Dr. Vincent's opinion did not compel the ALJ to find that Baker was incapable of performing work involving more than routine, repetitive tasks.

Next, Baker argues that the ALJ's RFC as to Baker's physical abilities inconsistent with Dr. Trudeau's EMG, the March 2001 MRI, Dr. Greatting's June 2000 examination, or Dr. Russell's July 2001 opinion.  Baker is incorrect. Dr. Trudeau's report is not inconsistent with the ALJ's RFC determination. When Dr. Trudeau examined Baker in 1999, she had tenderness to palpation in the right forearm, over the cervical region, and over the left shoulder. However, Dr. Trudeau noted that detailed NCVs were normal.   A detailed needle EMG revealed some right upper extremity irritability, but other muscles were normal.    Dr. Trudeau also noted that there was no evidence of radiculopathy, cervical root lesion, median neuropathy in the wrist or elbow, or

brachial plexopathy on either side.   Dr. Trudeau opined that cases such as Plaintiff's "heal with the passage of time" with conservative treatment.

Baker's reliance on Dr. Greatting's June 2000 examination is likewise misplaced because Dr. Greatting's examination found no certain cause of Baker's symptoms.   Although Dr. Greatting noted some findings suggestive of thoracic outlet and nerve entrapment, he offered no opinion as to any limitations.       Thus, Dr. Greatting's findings do not disprove the ALJ's determination.

The other evidence which Baker offers in her attempt to show error, a March 2001 cervical MRI and Dr. Russell's July 2001 progress notes, were not presented to the ALJ.   These materials were presented to the Appeals Council only.   Thus, they cannot be used to show that the ALJ's decision warrants a remand pursuant to the sixth sentence of 405(g)[2].

### C. Step 5 - Ability to Perform a Significant Number Of Jobs.

When the ALJ found Baker could not perform her past relevant work, the burden shifted to the Commissioner to establish that Baker could perform substantial gainful work given her RFC and vocational profile.   Steward, 858

[2]   Although Dr. Russell opined that Baker was not going to be "employable," such a conclusion is a vocational matter reserved to the Commissioner.  Moreover, by encouraging Baker to increase her activities and avoid narcotics (as Dr. Russell did in his report), Dr. Russell's report bolsters the ALJ's decision more than it discredits it.

18

F.2d at 1297 n. 2.    The ALJ met this burden.

The record shows that the ALJ relied on the VE's testimony to determine whether Baker could perform a significant number of jobs.  In response to the ALJ's hypothetical questions, the VE discussed the job possibilities available to a person with Baker's vocational factors and an RFC for light work that involved no more than occasional overhead work, no climbing or work at unprotected heights, or using a strong or sustained grip or grasp, and did not require rapid or repetitive head/neck turning.

The VE identified light jobs that such a person could do, including jobs as a cashier (30,000 statewide), and office clerk (8,000 statewide).  The large number of jobs showed that a significant number of positions were available to Baker.    See  Lee  v.  Sullivan, 988 F.2d 789, 794 (7th Cir. 1993)(1,400 job positions are a significant number).    The ALJ was entitled to rely on the VE's testimony because it was made in response to a hypothetical question that accurately portrayed Baker's impairments and vocational profile.    See  Herron v.  Shalala, 19 F.3d 329, 337 (7th Cir. 1994).

In sum, the record shows that the ALJ's decision is supported by substantial evidence.  Accordingly, the Court must affirm the Commissioner's decision.    See  Herr  v.  Sullivan, 912 F.2d 178, 181 (7th Cir. 1990).

<u>Therefore</u>, the Plaintiff's Motion for Summary Judgment (d/e 12) is DENIED and Defendant's Motion for Summary Judgment (d/e 15) is ALLOWED.

CASE  CLOSED.

ENTER:  March 29, 2006.

FOR THE COURT:

          s/Charles H. Evans
          CHARLES H. EVANS
        United States Magistrate Judge